# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY A. RAIMEY, as Administrator of the Estate of Matthew Burroughs, | ) | CASE NO. 4:20-cv-5 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| THE CITY OF NILES, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This case arises out of the fatal police shooting of Matthew Burroughs ("Burroughs") near an apartment complex in Niles, Ohio. Burroughs' estate, through plaintiff Timothy A. Raimey ("plaintiff"), brought this action under 42 U.S.C. § 1983 and state law against defendant the City of Niles (the "City") and the following members of the City's police department: Officer Christopher Mannella ("Officer Mannella"), Officer James Reppy ("Officer Reppy"), Officer Paul Hogan ("Officer Hogan"), and Chief of Police Jay Holland ("Chief Holland") (where appropriate, all defendants are collectively referred to as "defendants"). Defendants have moved for summary judgment. (Doc. No. 39 (MSJ).) The motion is fully briefed. (Doc. No. 44 (Opposition); Doc. No. 47 (Reply); Doc. No. 56 (Sur-Reply)[1].) For the reasons that follow, the motion is granted in part and denied in part.

---

[1] Plaintiff filed two identical sur-replies. (*See* Doc. Nos. 55 and 56.) To avoid confusion, any reference to the Sur-Reply is to Doc. No. 56.

## I. BACKGROUND[2]

As will be discussed in more detail below, portions of the pertinent events leading up to and including the shooting were recorded by the body worn camera ("BWC") of one officer—Officer Reppy.[3] When video evidence exists clearly depicting all of the relevant facts, the facts are viewed "in the light depicted by the videos." *See Gordon v. Bierenga*, 20 F.4th 1077, 1079 (6th Cir. 2021) (quoting *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007))). Where, as here, "the facts shown on video 'can be interpreted in multiple ways or if [the] videos do not show all relevant facts', [the court] view[s] those facts in the light most favorable to the non-moving party." *Id*. (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

That said, many of the facts leading up to the shooting are undisputed. On January 2, 2019, Burroughs appeared in the Niles Municipal Building for the purpose of paying a fine. While municipal court personnel were processing the fine payment, the court's electronic docketing system alerted that there was an active warrant for Burroughs' arrest. (Doc. No. 39-6 (Affidavit of Todd Zickefoose) ¶ 3.) Probation Officer Todd Zickefoose ("P.O. Zickefoose") was nearby and was asked to stand by the lobby area to make sure that Burroughs did not leave while court personnel summoned a police officer. (*Id*. ¶¶ 3–4.) As he waited and watched, P.O. Zickefoose heard Burroughs state that he would "be right back" before he exited the building

---

[2] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system, a citation practice recently adopted by the Court despite different directions in the Initial Standing Order in this case. Because many of the depositions were reproduced in a four to a page format, where a deposition citation includes a second number in parenthesis, the second number refers to the page number assigned by the court reporter.

[3] Indeed, Officer Reppy's BWC was the only camera to record any part of the shooting or the events leading up to it. Officer Mannella did not turn on his BWC until after all of the shots had been fired, and Officer Hogan failed to turn on his BWC at all before, during, or after the shooting. Both officers were reprimanded for violating the City's BWC policy. (Doc. No. 39-4 (Deposition of Christopher Mannella) at 17(59); Doc. No. 39-5 (Deposition of Paul Hogan) at 13(43).)

through the front doors. (*Id*. ¶ 5.) P.O. Zickefoose followed Burroughs and commanded him to stop, explaining that he needed to return inside the building because there was an active warrant for his arrest. (*Id*. ¶¶ 6–7.) P.O. Zickefoose pulled out his handcuffs and instructed Burroughs to place his hands behind his back. (*Id*. ¶ 8.) Burroughs asked P.O. Zickefoose why he was stopping him, and when P.O. repeated that Burroughs had an outstanding warrant, Burroughs took off down a hill and into the parking lot. (*Id*. ¶¶ 9–10.)

P.O. Zickefoose gave chase and caught up to Burroughs just as he was opening the door to a Ford Fusion parked in the lot. (*Id*. ¶ 11.) As Burroughs was getting into the car, P.O. Zickefoose grabbed Burroughs' arm and unsuccessfully attempted to pull him out. (*Id*. ¶ 12.) Burroughs started the car and put it in reverse, traveling at a high rate of speed. (*Id*. ¶ 13.) The car door hit P.O. Zickefoose in the midsection and knocked him down. (*Id*.; Doc. No. 39-3 (Deposition of Todd Nichols)[4] at 5(9, 12).) P.O. Zickefoose was unhurt and was able to get back up as Burroughs backed out of the parking lot and headed off down a city street. (Doc. No. 39-6 ¶¶ 14–15.) Before Burroughs exited the lot, P.O. Zickefoose was able to get the license plate number of the vehicle. (*Id*. ¶ 16.) The probation officer ran back into the building and reported what had transpired. (*Id*. ¶ 17.)

Officer Hogan was in the Niles Police Department—which is located in the basement of the Niles Municipal Building—finishing some paperwork at the end of his shift, when he was advised by court personnel that they were having a problem with an individual who had an outstanding warrant. (Doc. No. 39-5 at 5(11–12).) He learned that the individual had run out of the front door, so Officer Hogan headed to his squad car to search for the individual. (*Id*. at

---

[4] Mr. Nichols was seated in his car in the municipal building parking lot waiting for his son, who was inside meeting with his probation officer. (*Id*. at 3(4).) He witnessed the exchange between Burroughs and P.O. Zickefoose and was later deposed in connection with this litigation.

5(12).) As Officer Hogan was scouring the area in his patrol vehicle, he heard a radio report from dispatch advising that the individual had been identified as Burroughs and that he had struck a municipal employee before exiting the parking lot. (*Id*. at 6(13).) Officer Hogan was familiar with Burroughs, having previously responded to a complaint that Burroughs had struck a vehicle parked in the lot in front of the Royal Mall Apartments, where Burroughs lived. (*Id*. at 6(14).) Officer Hogan informed dispatch that he was heading to the apartment complex to look for Burroughs. (*Id*. at 6(15–16).)

Officer Mannella, who was working the day shift that morning, also heard the report from dispatch that an individual had fled the municipal building having fought with and struck a probation officer or a municipal court employee. (Doc. No. 39-4 at 10(32), 11(34).) He also remembers hearing a subsequent report identifying the individual as Burroughs. (*Id*. at 12(37).) Like Officer Hogan, he had some familiarity with Burroughs, having been aware that officers from the night shift had recently responded to a domestic violence incident involving Burroughs and his female roommate, wherein Burroughs allegedly threatened the female with a gun. (*Id*. at 10–11(32–33).) Officer Mannella further recalled that an FBI warning appeared on his vehicle's monitor advising that Burroughs had previously been involved in violent crimes against law enforcement. (*Id*. at 12(37, 39).) When he heard Officer Hogan's plan to look for Burroughs at his apartment, Officer Mannella decided to proceed to the apartment to back him up. (*Id*. at 11–12(36–37).) Officer Mannella located Officer Hogan's cruiser en route and followed him into the area surrounding the apartment complex. (Doc. No. 39-5 at 6–7(16–17).) Officer Hogan drove around the complex while Officer Mannella exited his vehicle and canvased the area on foot. (*Id*. at 7(18–19); Doc. No. 39-4 at 12–13(40–41).) Officer Mannella intended to go to Burroughs'

4

apartment and warn Burroughs' female roommate that Burroughs was likely on his way back to the apartment. (Doc. No. 39-4 at 13(43–44).)

Meanwhile, Officer Reppy was one of the officers driving the streets near the municipal building looking for Burroughs. (Doc. No. 39-2 (Deposition of James Reppy) at 6(12).) He was also one of the officers who had responded to the prior domestic violence incident involving Burroughs and the female roommate. (*Id*. at 11–12(32–34).)[5] He located the Ford Fusion driving in a residential area, heading westbound toward the apartment complex. (*Id*. at 7(13), 12(36).) Officer Reppy estimated that Burroughs was traveling 40 to 45 miles per hour, which he added was a high rate of speed for the area. (*Id*. at 7(14), 12–13(36–37).) Officer Reppy caught up to the Ford Fusion as Burroughs was approaching the apartment complex, noting that there was moderate to no traffic at the time. (*Id*. at 12–13(36–37).) As he was closing in on Burroughs' vehicle, another officer—Lieutenant Dan Adkins—came into his view, and Lieutenant Adkins called out to him pointing to the Ford Fusion as the vehicle for which they were searching. (*Id*. at 13(37).)

Given Burroughs' rate of speed and the fact that he was fleeing law enforcement, Officer Reppy decided to activate his BWC, which he wore over his sternum. (*Id*. at 13(38–39).) He was also concerned that the chase might turn into a foot race, and he did not want to have to remember to activate the camera later. (*Id*. at 13(39).) From the BWC, Officer Reppy can be heard advising Lieutenant Adkins, "Yeah, I've been chasing this guy for a while." (*Id*. at 13(39–40).) He headed westbound down Royal Mall Drive towards the apartment complex in pursuit of Burroughs with Lieutenant Akins following closely behind. (*Id*. at 13(37).)

---

[5] Officer Reppy explained that, during this prior encounter, he spoke with Burroughs. He determined that Burroughs had not harmed anyone and that there was no basis upon which to arrest him at that time. (*Id*. at 12(33–34).)

Officer Hogan testified that he was about ready to leave the apartment complex when he saw the Ford Fusion pull into the apartment complex, followed closely by two City police cruisers—those of Officer Reppy and Lieutenant Adkins. (Doc. No. 39-5 at 7–8(20–21).) Officer Hogan estimated that the Ford Fusion was traveling between 30 to 35 miles per hour as it entered the complex and drove toward the area where the officer was parked. (*Id*. at 8(22).) He added that Burroughs' speed was "[d]ecent but not over [the speed limit]." (*Id*.) Officer Hogan remembered that Officer Reppy had his overhead lights on at the time but did not remember a siren. (*Id*. at 8(22–23).) As the Ford Fusion approached the front of Officer Hogan's vehicle, Officer Hogan can be heard on Officer Reppy's BWC saying, "I don't think he's going to stop, Dan" (referring to Lieutenant Adkins). (*Id*. at 8(23).) Burroughs did stop and, when he did, his vehicle was "hood to hood" with Officer Hogan's cruiser. (*Id*. at 8(23).) Burroughs did not hit Officer Hogan's cruiser, and Officer Hogan conceded that Burroughs performed a "controlled" stop and did not appear to slam on his breaks. (*Id*. at 9(25–26).) Still, Officer Hogan was close enough to see Burroughs use the stick shift to put his car into reverse. (*Id*. 8(23), 9(25); *see* Doc. No. 39-4 at 6(14).) He estimated that Burroughs traveled in reverse at a speed of 25–30 miles per hour. According to Officer Hogan, Burroughs' speed was not "excessive." (*Id*. at 9(27).)

The parties' accounts of the events that next unfolded, and that led to the fatal shooting, diverge significantly.

## A.     Defendants' Version of the Facts

Defendants agree that Burroughs appeared to be maneuvering his vehicle to avoid being blocked in by Officer Hogan and Officer Reppy, who was pulling into the apartment complex behind the Ford Fusion (though, as previously noted above, Officer Hogan was initially concerned that Burroughs was going to hit his cruiser before he stopped in very close proximity

6

to the patrol car). (Doc. No. 39-4 at 6(14).) Burroughs then backed up without hitting Officer Reppy's vehicle, and headed forward toward Officer Mannella, who had approached the front of Burroughs' vehicle on foot. Officer Mannella began pumping his hands and commanding Burroughs to stop, but Burroughs turned the Ford Fusion toward Officer Mannella and began to advance on his position. (*Id*. at 6(14), 6(16), 8(23); Doc. No. 39-5 at 11(35–6.) Defendants contend that Officer Mannella was standing in the path of Burroughs' car, with the officer positioned directly in the center in front of Burrough's hood. (Doc. No. 39-5 at 12(40).) Officer Mannella estimated that Burroughs was traveling toward him between 20 and 25 miles an hour when he fired the first of three shots in rapid succession into the front windshield of the Ford Fusion. (Doc. No. 39-4 at 6(15–16).) As he shot, he was quickly stepping toward his left, but because Burroughs was turning his vehicle towards the right, this put Officer Mannella "in the front of the vehicle every step [he] took." (*Id*. at 26(94).) Indeed, the video shows that the front wheels were turned to the right. Officer Mannella stopped firing when Burroughs' vehicle stopped moving, and he believes that the force of his shots caused the vehicle to stop. (*Id*. at 8(22), 27(98).)

Before Officer Mannella fired his first shot, Officer Reppy exited his cruiser. As he approached the Ford Fusion from the passenger side, the sound of Officer Mannella's first shot can be heard on his BWC, though the camera did not capture either Burroughs' vehicle or Officer Mannella's position vis-a-vis the Ford Fusion. Upon hearing Officer Mannella discharge his weapon, Officer Reppy continued to approach Burroughs' vehicle on foot, raised his own service weapon, and eventually fired five additional rounds into the Ford Fusion. Defendants contend that the officers used deadly force because Officer Mannella was in imminent danger of being run over by Burroughs as he tried to escape.

B.        Plaintiff's Version of the Events

In plaintiff's version of the facts, Burroughs was complying with Officer Mannella's commands and was bringing his car to a stop when Officer Mannella opened fire. Further, plaintiff insists that Officer Mannella was never in the path of Burroughs' vehicle, as he had assumed a position to the right of the Ford Fusion and was never in danger of death or serious harm from Burroughs. While plaintiff believes that his account is entirely supported by the video from Officer Reppy's BWC and witness accounts, he also relies on the expert report of Jason Fries, who prepared a reconstruction of the shooting using 3D imaging. After running tests with an exemplar vehicle, he determined that the Ford Fusion was traveling no faster than 5 to 6 miles per hour and was likely not moving at all when Officer Mannella discharged his weapon with the vehicle pointed away from Officer Mannella. (Doc. No. 44-2 (Expert Report of Jason Fries ["Fries Report"]) at 11–12.)[6] He further opined that, before Officer Mannella discharged his weapon for the first time, he was positioned to the right of the Ford Fusion, outside of the path of the vehicle, and that the officer had sufficient time to react to the fact that Burroughs was complying and in the process of stopping his vehicle. (*Id*. at 11–12.)[7] According to plaintiff, Fries' opinions are supported by witness testimony and the fact that Office Reppy's BWC shows the following: the Ford Fusion's brake lights are illuminated, Officer Mannella is positioned to the right of the vehicle, and the vehicle is not moving. (Doc. No. 44 at 14.)

---

[6] Fries also opined that the bullet pattern made from Officer' Mannella's shots confirmed that the vehicle was moving very slowing at the time he shot in rapid succession. (*Id*. at 7.)

[7] Assuming an estimated perception and reaction time of 2.2 seconds, Fries opined that Officer Mannella "perceived [] Burroughs to be a threat the moment the vehicle had started to move. At this point, the vehicle would have a speed of [no] greater than 0 MPH." (*Id*. at 12.)

### C.    Additional Facts

It is undisputed that the three rounds fired by Officer Mannella struck Burroughs in the chest, ending his life. Each of the rounds fired by Officer Reppy missed Burroughs. (Doc. No. 39 at 12.) After Officer Reppy fired his weapon, he approached the Ford Fusion with his weapon still drawn. Because the doors to the vehicle were locked, the officers had to break the passenger window with an asp in order to gain entry. (Doc. No. 39-2 at 20(65); Doc. No. 39-7 (Affidavit of Daniel Adkins) ¶ 6.) When the officers opened the door to remove Burroughs, the car lurched forward before it hit a dumpster and came to a complete stop. (Doc. No. 39-2 at 20(65); Doc. No. 39-7 ¶ 8) The medical examiner pronounced Burroughs dead at the scene.

Following the shooting, the Ohio Attorney General's Office, Bureau of Criminal Investigation ("BCI"), conducted an internal investigation. (Doc. No. No. 44-3 ("BCI Report").) As part of the investigation, BCI interviewed the officers involved, as well as other witnesses, and reviewed footage from the officers' BWCs and other physical evidence. BCI determined that Officers Mannella and Reppy complied with the City's Use of Force policy, and further determined that there was no basis for criminal charges against the officers. (*See generally id.*)

Plaintiff filed the present action on January 2, 2020 in federal court. The complaint purports to raise federal claims for excessive force against the officers, pursuant to 42 U.S.C. § 1983; and municipal liability against the City, pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). (Doc. No. 1 (Complaint).) Plaintiff also brings state law claims for wrongful death, assault and battery, and reckless conduct.  (*Id.*)

In their summary judgment motion, defendants argue that each defendant officer is entitled to qualified immunity with respect to the § 1983 claims. According to defendants, the officers did not violate Burroughs' Fourth Amendment rights because the use of force was

reasonable under the circumstances to prevent death or serious harm to Officer Mannella. Further, defendants insist that the City and Chief Holland cannot be found liable under theories of municipal or supervisory liability. Finally, defendants contend that all of the defendants are entitled to statutory immunity from the state law claims.

## I. EVIDENTIARY MATTERS RELATING TO SUMMARY JUDGMENT

Before the Court can reach the merits of the dispositive motion, it must address two evidentiary matters that defendants have raised in connection with plaintiff's opposition to summary judgment. First, defendants insist that Fries' expert opinions should be disregarded because they rest on speculation and faulty methodology. Second, given the existence of video footage from Officer Reppy's BWC, defendants suggest that the facts under consideration should be limited to those "objective facts" found in the record.[8] The Court will address each argument in turn.

### A. *Daubert* Challenge

On April 15, 2021, plaintiff served his Rule 26 expert disclosures on defendants. Among them, plaintiff provided a 15-page report and corresponding forensic 3D animation/re-creation from Jason Fries. (Doc. No. 48 at 1; *see* Doc. No. 44-2.) The Fries Report included specific calculations of speed and distance and disclosed Fries' opinions concerning the speed of Burroughs' vehicle and its relative position to Officer Mannella. Plaintiff relies, in part, on the calculations performed and the conclusions reached by Fries in his expert report in defending

---

[8] Defendants also take issue with plaintiff's reliance on the summary of a witness statement recorded in the BCI Report. (Doc. No. 47 at 6.) In his opposition brief, plaintiff references the statement of Michael Cappy—an eyewitness to the shooting—who was interviewed by BCI. (Doc. No. 44 at 14 (citing Doc. No. 44-3 at 12–13).) In partial support of his argument that Officer Mannella was not in the path of the Ford Fusion, he cites to Mr. Cappy's reported recollection that Officer Mannella was positioned to the right side of the vehicle. (*Id.*) It is defendants' position that the summary of the statement of Mr. Cappy is not acceptable evidence under Fed. R. Civ. P. 56. The Court need not resolve this evidentiary dispute as it does not rely on Mr. Cappy's statement, or the summary of the statement appearing in the BCI Report, in ruling on defendants' summary judgment motion.

summary judgment. Defendants elected not to dispose Fries during discovery. Instead, in their reply brief in support of summary judgment, defendants take issue with plaintiff's reliance on the Fries Report, maintaining that the report is devoid of "any detailed explanation of the process or methodology used to create the 3D animation, the vehicle speed re-creation, or the calculation of Officer Mannella's reaction time."[9] (Doc. No. 47 at 8.)

> *1. Standard of Review*

The Court's analysis of Fries' expert report is governed by Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Sixth Circuit Court of Appeals has explained:

> Rule 702, in concert with other Rules of Evidence, empowers the district court to ensure that the expert's testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The court plays this same gatekeeping function even if the expert's opinion is "technical," rather than scientific, in nature. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). This line of cases governing the district court's screening of experts seeks to "strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.,* 563 F.3d 171, 176–77 (6th Cir. 2009).

*Ask Chems., LP v. Computer Packages, Inc.,* 593 F. App'x 506, 509 (6th Cir. 2014).

There is no "definitive checklist or test" to strike this balance, but relevant factors include: (1) whether a theory or technique "can be (and has been) tested[;]" (2) whether a "theory

---

[9] Plaintiff does not offer the 3D re-creation of the shooting created by Fries, or otherwise rely on it, on summary judgment. Accordingly, the Court makes no determination at this time as to the reliability or admissibility of this piece of evidence.

or technique has been subjected to peer review and publication;" (3) the "known or potential rate of error;" and (4) whether the theory or technique is generally accepted. *See Daubert*, 509 U.S. at 590–94 (citations omitted). These factors are not exhaustive, however, and the inquiry is "a flexible one[.]" *Pluck v. BP Oil Pipeline Co*., 640 F.3d 671, 677 (6th Cir. 2011) (citations omitted).

The Court's "gatekeeping inquiry must be 'tied to the facts of a particular case.'" *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591) (internal quotation marks omitted). But the Court is not "required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Nelson v. Tenn. Gas Pipeline Co*., 243 F.3d 244, 254 (6th Cir. 2001) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)).

That said, the Sixth Circuit has explained "that 'rejection of expert testimony is the exception, rather than the rule.'" *Burgett v. Troy–Bilt LLC,* 579 F. App'x 372, 376 (6th Cir. 2014) (citation omitted). In general, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

A "'witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion' if the expert's technical or 'other specialized knowledge' will help the jury understand the evidence or determine a fact in issue." *In re Ford Motor Co. Spark Plug & 3-Valve Engine Prods. Liab. Litig.*, 98 F. Supp. 3d 919, 925 (N.D. Ohio 2014) (quoting Fed. R. Evid. 702(a)); *see also In re Polyurethane Foam Antitrust Litig.*, No. 1:10-md-2196, 2015 WL 12748012, at *1 (N.D. Ohio July 16, 2015) ("Expert opinion testimony

involves application of 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting Fed. R. Evid. 702(a)).

But "[i]t is well established that an expert witness's testimony is not helpful 'where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic.'" *Jones v. Pramstaller*, 874 F. Supp. 2d 713, 720 (W.D. Mich. 2012) (quoting Charles Alan Wright et al., 29 *Federal Practice & Procedure Evidence* § 6264); *see also In re Polyurethane Foam Antitrust Litig.*, No. 1:10-md-2196, 2015 WL 12748012, at *1 ("The nub of this helpfulness requirement is to exclude testimony where the witness is no better suited than the jury to make the judgment at issue, providing assurance against the admission of opinions which would merely tell the jury what result to reach.") (quoting *United States v. Diaz-Arias*, 717 F.3d 1, 12 (1st Cir. 2013) (internal quotation marks omitted)). Expert testimony that is not helpful to the jury "creates the danger that a jury may unnecessarily defer to the judgment of a highly credentialed expert, when in fact the law considers lay jurors just as capable as [the expert] to decide whether evidence establishes some fact." *Id.* (citing *Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1340 (11th Cir. 2012) ("when jurors need no assistance to understand the fact at issue, the expert's testimony [on the same facts] may lend undue credence to one party's view of the facts because that testimony bears the imprimatur of an expert")).

A court need not hold a *Daubert* hearing but must ensure that the disputed testimony is relevant and reliable. *See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000). It is plaintiff's burden to establish that Fries' opinions in this case are admissible under the applicable

standard. *Nelson*, 243 F.3d at 251 ("It is the proponent of the testimony that must establish its admissibility by a preponderance of proof.") (citing *Daubert*, 509 U.S. at 592 n.10).

       2.     *Discussion*

Defendants do not specifically challenge plaintiff's expert's qualifications. Jason Fries holds a degree in biology from San Diego State University with a focus in chemistry and physics. He has twenty-two years of experience in the "fields of forensic animation, forensic laser scanning, forensic video analysis, laser-based photogrammetry, and scientific method[,]" and has been qualified as an expert in these fields, as well as in line of site analysis and human factors involved in Officer-Involved Shooting ("OIS") incidents.  (Doc. No. 44-2 at 2.) During his career, he has created over 3000 computer animations for use in trial, and is a member of the Society of Forensic Engineers and Scientists as well as the Forensic Expert Witness Association. He has been invited to lecture in the field of forensic analysis at conferences throughout the country and has served as a guest lecturer at Hastings School of Law, Force Scient Institute, and Human Factors & Ergonomics Society, among others. Additionally, Fries has been a trainer for multiple law enforcement agencies and currently serves as the chief executive officer for 3D Forensic, Inc. *Id*. The Court finds that Fries is qualified to offer all relevant and appropriate opinions appearing in the Fries Report.

Defendants also do not seriously challenge the relevancy of the proffered expert opinions. Testimony is relevant if it helps the factfinder understand the facts. *Daubert*, 509 U.S. at 591. Relevance means "there must be a 'fit' between the inquiry in the case and the testimony[.]" *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993). Here, Fries claims he relied on the factual record (including the BWC of Officer Reppy) to recreate the scene of the shooting and draw his conclusions therefrom in order to "help the finder of fact understand the scene in the

moments before, during, and immediately after the incident." *See Krause v. Cnty. of Mohave*, 459 F. Supp. 3d 1258, 1271 (D. Ariz. 2020) (finding shooting reconstruction relevant in civil rights action). Because Fries' opinions fit neatly within the relevant inquires of the case—namely, the speed of the Ford Fusion and orientation relative to Officer Reppy at the moment the officer employed deadly force—the Court finds that Fries' reconstruction and resulting conclusions are relevant.

Defendants focus their objections on the methodology used to reach those conclusions. As an initial matter, defendants argue that the Fries Report is a "fiction" created by an expert to "purposefully manipulat[e]" the record evidence and is nothing more than a "fantastical re-creation promoted by the plaintiff and his expert."[10] (Doc. No. 47 at 5–6.) Without support or elaboration, defendants suggest that the conclusions in the Fries Report are "refuted in every way" by the physical evidence in the case, including Officer Reppy's BWC.[11] (*Id*. at 6.) Yet, the Fries Report is clear that Fries purports to rely primarily upon Officer Reppy's BWC in reconstructing the scene and drawing conclusions therefrom. (Doc. No. 44-2 at 5.) Courts

---

[10] To the extent defendants argue that plaintiff may not defend summary judgment with an unsworn expert opinion where sworn deposition testimony is available (*see* Doc. No. 47 at 2–3), they are mistaken. In *Sigler v. Am. Honda Motor Co*., 532 F.3d 469 (6th Cir. 2008), the Sixth Circuit held that an unsworn expert report is hearsay and, therefore, unavailable to support a motion for summary judgment. *Sigler* is inapplicable because, there, it was the moving party that offered the unsworn expert reports. Here, in contrast, the non-moving party is offering the expert report in opposition to a summary judgment motion. It is well settled that a non-moving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Where it is the non-moving party that is offering the unsworn report, the relevant inquiry is whether the evidence submitted in non-admissible form during the summary judgment stage "will be reduced to admissible form at trial." *DeBasi v. Charter Cnty. of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008) (quotation marks and citation omitted). Defendants have not suggested that the opinions contained in the Fries Report are incapable of being reduced to admissible form. Accordingly, the Court finds that the unsworn expert report is properly considered on summary judgment. *See, e.g., Davis v. United States*, 302 F. Supp. 3d 951, 956 (S.D. Ohio 2017) (Unsworn letters from expert witness were appropriately considered in defense of summary judgment) (citing *Allen v. Shawney*, No. 11-cv-10942, 2014 WL 1089618, at *9–10 (E.D. Mich. Mar. 18, 2014), *aff'd*, No. 14-1510 (6th Cir. June 3, 2015)).

[11] As will be discussed in the next section, the Reppy BWC does not conclusively support defendants' position, and leaves room for plaintiff's theory of the case.

regularly approve of the use of scene reconstructions that are based on reliable scientific methods and tied to record evidence. *See, e.g., Clay*, 215 F.3d at 668 (approving of reconstruction based on "photographs of the vehicle and the road" and "a scale of drawing of the highway where the accident occurred"). In *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 446 (6th Cir. 2012), the Sixth Circuit held that the district court erred by excluding an expert report based on photographs, observation of the scene, testimony, and calculations derived thereof. Like the Fries Report, its conclusions were based on "a photogrammetric analysis, which entails using known measurements of objects in a photograph to extract measurements of, or measurements to, objects that are not known" and "calculations and algebraic equations using a computer program[.]" *Id*. The court found that such methods "sufficiently relied on the laws of physics and mathematics generally employed in accident reconstruction[.]" *Id.*

Defendants also suggest that "[n]otably absent from the Fries Report is any detailed explanation of the process or methodology used to create the 3D animation, the vehicle speed recreation, or the calculation of Officer Mannella's recreation time." (Doc. No. 47 at 8.) Plaintiff counters that defendants' objection "ignores the lengthy sections" in which Fries "outlines the steps of his analysis, the software tools used, and other considerations." (Doc. No. 55 at 6.) To resolve this dispute, the Court focuses on Fries' explanation of the methodology and principles he used, not on his conclusions. *See Daubert*, 509 U.S. at 595.

Applying this analysis, the Court finds that plaintiff has the better argument. In his report, Fries outlined his eight-point action plan, which entailed:

- Review[ing] all BWC footage of those involved in this OIS event.
- Laser scan[ning] the incident area (55 Royal Mall Dr.).
- Camera match[ing] the laser scan to the BWC camera footage.
- Track[ing] the location of the vehicles during the incident.
- Track[ing] the location of the police officers during the incident.

- Perform[ing] laser-based photogrammetry to reverse engineer the location/size and shape of the environment, vehicles and people involved.
- Analyz[ing] the relative distances of all parties involved[, and]
- Run[ning] a test of an exemplar vehicle to calculate acceleration abilities of Mr. Burroughs's vehicle.

(Doc. No. 44-2 at 3.) He then explained, in detail, the methodology used to perform each step of his action plan. For example, with respect to the second step in his plan, he explained that:

> On November 29th, 2020, we had the incident area (55 Royal Mall Dr) laser scanned using a Leica P30 laser scanner. The incident area was scanned using 25 different locations. These files were registered using Cyclone software and processed using Autodesk Recap before being placed within 3D Studio Max 2020.

(*Id*. at 4.) Similarly, after providing a detailed explanation for the next several steps in the action plan, Fries explained the process by which he tracked the location of Burroughs' vehicle and the officers (a step that defendants claim is insufficiently detailed). Specifically, the report provides:

> For us to understand the 3D location of the officers (Reppy and Mannella), Mr. Burroughs's vehicle, and the other police vehicles seen in the BWC, we need to camera match the vehicles and officers at key moments during the incident.
>
> By matching the position of the camera to the laser scan environment, we can view key moments from different angles and derive vital measurements of our analysis. Using data collected from the laser scan of the incident area, we are able to reverse engineer the location of the BWC that recorded the events. This recording, in effect, is recording its own location as well as the location of all people and vehicles seen in the video.
>
> While we were given diagrams created by the Ohio Bureau of Criminal Investigation (BCI) of the incident area, their diagram did not give us locations of the officers during the shooting incident, the location of Mr. Burroughs's vehicle, or how it moved after the shooting incident was over. By using laser-based photogrammetry (the process of using laser-based measurement to extract 3D measurements from a video or still photo), we were able to reverse engineer the location of Ofc. Reppy, Ofc. Mannella (once seen in the video), Mr. Burroughs's vehicle (once seen on the video) and the locations of Mr. Reppy's and other police vehicles.

(*Id*. at 6.)

17

Defendants fail to cite to any authority holding that such level of detail is inadequate. Rather, the report clearly explains the process by which Fries completed each step of his action plan, the forensic tools he employed, and the data upon which he relied. Of course, to the extent that defendants had unresolved questions regarding the methodology Fries employed, or the conclusions he reached by means of this methodology, they could have deposed him. They could have also provided expert testimony to establish why they believe Fries' methodology is unreliable. They chose not to do so. At trial, defendants will have an opportunity to cross-examine Fries as to his methodology and the factual bases for his opinions. *See Johnson v. BLC Lexington SNF, LLC*, 478 F. Supp. 3d 578, 590 (E.D. Ky. 2020) (any weaknesses in the factual bases of an expert witness opinion bears upon the weight of the evidence rather than its admissibility) (citing *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 801 (6th Cir. 2000)). For now, however, the Court finds that there is nothing about the level of detail in the Fries Report that calls the reliability of Fries' methodology into question.

Defendants also complain that, in addition to a lack of detail, Fries' conclusions as to the speed of the vehicle and Officer Mannella's perception and reaction time should be disregarded because they are based on speculation. In particular, defendants underscore the fact that Fries only cites one study that he consulted in connection with his calculation of perception and reaction time. (Doc. No. 47 at 9.) However, Fries, himself, is an expert in the area of human factors relating to OIS incidents by training and experience (a fact that defendants do not challenge), and defendants fail to explain how his reliance on one particular study renders the resulting scientific calculations unreliable. *See Clay*, 215 F.3d at 668 (merely alleging that an expert has failed to adequately test a theory, without also challenging the principle underlying it, goes to the weight, not admissibility of the expert's testimony); *see also Southard v. Belanger*,

18

966 F. Supp. 2d 727, 733 (W.D. Ky. 2013) (finding that human factors considerations are a vital part of accident reconstruction); *Benoit v. Westport Ins. Corp.*, No. 07-cv-1109, 2009 WL 2970429, at *3 n.3 (W.D. La. Aug. 21, 2009) (noting that "accident reconstruction experts regularly testify . . . as to a person's expected reaction time"). Such an argument is best reserved for cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

Ultimately, given the record at this stage, the Court concludes that Fries applied reliable scientific principles and methods to the facts of the case to arrive at his conclusions. To the extent that defendants argue that Fries' conclusions are not sufficiently supported by the record, that is a matter for cross-examination rather than the exclusion of the expert report on summary judgment. *See Rose v. Truck Ctrs, Inc.*, 611 F. Supp. 2d 745, 751 (N.D. Ohio 2009) (citing *McLean*, 224 F.3d at 801 (quotation marks and citations omitted)).

### B.   Existence of Video Footage

Even if Fries' opinions satisfy the *Daubert* inquiry, defendants argue that they should not be considered on summary judgment because of the existence of video footage from Officer Reppy's BWC. According to defendants, "[s]ince the events in this case are recorded on video, the facts are viewed in the video's light, not in a light favorable to plaintiff." (Doc. No. 47 at 11 (quotation marks and citations omitted).)

It is true there are limited circumstances in which a court may disregard one party's version of the facts at summary judgment. In *Scott*, 550 U.S. at 379–80, the plaintiff claimed he was driving safely while being pursued by police, but the video evidence unquestionably showed he was racing down a narrow street at an extremely high rate of speed, running red lights, and

weaving in and out of traffic. The Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Id*. at 380. The fact issue was whether plaintiff was driving in a manner that would endanger human life, and the Court reasoned that his version of events was "so utterly discredited by the record that no reasonable jury could have believed him." *Id*.

Unlike the situation in *Scott*, the video from Officer Reppy's BWC only captured portions of the events surrounding the shooting. Given that Officer Reppy was running toward the scene, with his BWC shifting as he moved, the video often displayed images of the empty sky or events taking place to the right or left of the shooting. Critically, the video does not provide a visual of Officer Mannella firing the first shot or show where he was positioned in relation to the Ford Fusion when he first discharged his weapon. And even the brief glimpses of the Ford Fusion and Officer Mannella in the seconds that followed are somewhat obscured by Officer Reppy's body as he drew his own service weapon and fired. Because the video does not provide unequivocal and clear images that allow for definitive conclusions regarding the movements of the Ford Fusion and Officer Mannella, it does not prove (or disprove) either party's position. Therefore, the factual scenario in *Scott* where the video "blatantly contracted" one side's version of the facts simply does not exist here. *See id*. at 380; *see, e.g., Ferguson v. McDonough*, 13 F.4th 574, 583 (7th Cir. 2021) (where the audio from a police dashcam video was not clear, the video did not utterly discredit plaintiff's position that he was not actively resisting arrest at the time he was tased, and *Scott* was inapplicable); *Ramirez v. Martinez*, 716 F.3d 369, 374–75 (5th Cir. 2013) (*Scott* did not "control" the standard of review where the contents of the video were too uncertain to discount plaintiff's version of events); *Montoya v.*

*Ramos*, No. 1:13-cv-773, 2017 WL 3727023, at *6 (D.N.M. Aug. 28, 2017) (party's version of events was not "blatantly contradicted" by darkened images from officer's lapel camera); *see also Toner v. Vill. of Elkton*, 547 F. App'x 720, 726 (6th Cir. 2013) (reversing district court's grant of summary judgment to defendants where the "video and audio recording and surrounding circumstances could neither prove nor disprove" the plaintiff's testimony).

What the video demonstrates is that the incident surrounding the shooting unfolded in seconds. But the video does not necessarily disprove plaintiff's contention that Burroughs was complying with Officer Mannella's commands and was slowing to a stop at the time he was shot. Rather, it appears to show that at some point Burroughs' brake lights illuminated, suggesting that, for some reason, whether he was slowing or changing direction, Burroughs may have been braking at the time. The video also shows Officer Mannella positioned to the right of the Ford Fusion, and the vehicle at a time when the front wheels are turned toward him.  Given the brake lights, it does not appear that the car is moving at this instant. Based on this BWC footage, as well as witness testimony, it is for the jury to determine what transpired.. As such, this is not one of the "exceedingly rare" instances where *Scott* applies. Additionally, at this stage, the Court must view the evidence in the light most favorable to plaintiff.[12] *See Ferchak v. City of Burton*,

---

[12] Defendants' reference to *Cunningham v. Shelby Cnty.*, 994 F.3d 761 (6th Cir. 2021) does not change the conclusion. (*See* Doc. No. 47 at 11.) In *Cunningham*, the Sixth Circuit ruled that the district court erred in relying on "screen shots" of the officers' dashcams in denying the defendant-officers summary judgment. *Cunningham* is distinguishable for two important reasons. First, because the entire shooting incident was captured on the dashcams, unlike the situation presented here, the court found that *Scott* controlled and the facts should have been considered in the light depicted by the videotapes. *Id*. at 763, 766. Second, the court found that the district court erred in considering screen shots from the videos in deciding whether the use of force was objectively unreasonable because "the deputies' perspective did not include leisurely stop-action viewing of the real-time situation that they encountered[,]" *id.* at 767. Here, the Court does not rely on still shots in finding questions of fact, but (as discussed more thoroughly below) relies on Fries' calculations and opinions, derived from a re-construction of the shooting and exemplar testing, relating to the real-time speed of the Ford Fusion and the location of Officer Mannella at the time he fired his weapon. These opinions, which are arguably supported by Officer Reppy's BWC and officer testimony, are entirely relevant as to the question of how a reasonable officer would have perceived the events as they unfolded. *See Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) ("the 'reasonableness' of a particular use of force must be judged from the perspective of the reasonable officer on the scene"). They also serve to test the credibility of Officer Mannella regarding his version of those events.

No. 19-cv-12141, 2021 WL 778910, at *8 (E.D. Mich. Feb. 28, 2021); *see, e.g., Sweatt v. Doxtader*, 986 F. Supp. 2d 886, 889 (E.D. Mich. 2013) (distinguishing *Scott* and viewing the facts in the light most favorable to the non-moving party where portions of the audio tape were garbled and indecipherable).

## II.  DEFENDANTS' SUMMARY JUDGMENT MOTION

### A.      The City, Chief Holland, and Officers Reppy and Hogan

In their motion, defendants argue that Officers Reppy and Hogan, and Chief Holland—to the extent he was sued in his individual capacity—are entitled to qualified immunity. (Doc. No. 39 at 13–20.) Defendants further argue that the *Monell* claim(s) against the City and Chief Holland must be dismissed, in part, because plaintiff fails to point to any acts by either defendant that would support his allegations of failure to train and the creation of policies or practices causing constitutional violations. (*Id.* at 20–22.) Finally, defendants maintain that these defendants are entitled to statutory immunity under Ohio Rev. Code § 2744. (*Id.* at 22–25.)

Plaintiff offers no arguments in opposition to summary judgment for the City, Chief Holland, and Officers Reppy and Hogan, and, in fact, plaintiff indicates that he "does not oppose summary judgment in favor of" these defendants. (Doc. No. 44 at 7 n.1.) Accordingly, for the reasons set forth in defendants' summary judgment motion, the Court grants summary dismissal to the City, Chief Holland, and Officers Reppy and Hogan. The remainder of this memorandum opinion will address Officer Mannella's motion for summary judgment.

**B.      Summary Judgment Standard**

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary

judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### C.    General Law on Excessive Force and Qualified Immunity

Officer Mannella—who, it is undisputed, fired the fatal shots—also seeks qualified immunity for plaintiff's § 1983 excessive force claim. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (citation omitted). "Qualified immunity provides police officers 'breathing room to make

reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 571 U.S. 3, 6, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013)). Qualified immunity will apply "'if officers of reasonable competence could disagree on the issue.'" *Id*. (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first. *See Pearson*, 555 U.S. at 236.

It is axiomatic that a citizen has a constitutional right, secured by the Fourth Amendment, not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Excessive force cases are analyzed under an "objective reasonableness" standard. *Id*. at 388. Whether or not a use of force is reasonable requires balancing of "the nature and quality of

the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (quotation marks and citation omitted). Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9); *see Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (citing *Dunigan*, 390 F.3d at 492) (further citation omitted). "This is an objective test, to be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Withers v. City of Cleveland*, 640 F. App'x 416, 419 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).

 "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citation omitted). "Further, 'the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Sigley*, 437 F.3d at 534 (quoting *Graham*, 490 U.S. at 396–97).

An officer's use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others[.]" *Garner*, 471 U.S. at 11; *see Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious physical threat either to the

police or members of the public.") (citations omitted). Ultimately, the plaintiff bears the burden of demonstrating that any force used was unjustified in order to establish a constitutional deprivation. *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir. 1989) (citations omitted).

With respect to the second inquiry, a law is clearly established if, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable officer would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, --U.S.--, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (internal quotation marks and citation omitted). "[C]ourts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id*. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014)). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the [conduct] 'beyond debate.'" *Id*. (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)).

### D. Law on Deadly Force involving Vehicular Flight

"The Sixth Circuit has developed 'a consistent framework in assessing deadly-force claims involving vehicular flight.'" *Latits*, 878 F.3d at 548 (quoting *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014)). "The 'critical question' is whether the officer had objective 'reason to believe that the [fleeing] car presents an imminent danger' to 'officers and members of the public in the area.'" *Id*. (quoting *Cass*, 770 F.3d at 375) (further quotation marks and citation omitted). "Deadly force is justified against 'a driver who objectively appears ready to drive into an officer or bystander with his car," but generally not 'once the car moves away, leaving the officer and bystanders in a position of safety,' unless 'the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car.'" *Id.* (quoting *Cass*,

27

77 F.3d at 375) (further citation omitted). "The Sixth Circuit has found deadly force justified by prior interactions demonstrating continuing dangerousness only when the 'suspect demonstrated multiple times that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around.'" *Id*. (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)). "Thus, in evaluating the reasonableness of deadly force in the context of a fleeing driver, [the court] must look both to whether anyone was in the car's immediate path at the time of the shooting and to the officer's prior interactions with the driver that show potential for 'imminent danger to other officers or members of the public in the area' if the driver is permitted to continue fleeing." *Gordon*, 20 F.4th at 1083 (quoting *Latits*, 878 F.3d at 549).

The parties have directed the Court to cases that they believe are especially instructive and/or determinative on the use of deadly force under circumstances similar to those presented in this case. Given that the qualified immunity analysis "depends very much on the facts of each case[,]" the Court will review the factual backgrounds of these cases before it draws any conclusions as to the reasonableness of Officer Mannella's actions. *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004).

Defendants suggest that the present record "mirror[s], in many ways," the facts in *Williams*. (Doc. No. 39 at 16.) There, police pursued the plaintiff's vehicle until the plaintiff placed the vehicle in reverse colliding with a police cruiser. *Williams*, 496 F.3d at 484. Following the collision, the officer exited his cruiser with his weapon drawn and reached into the plaintiff's vehicle. In an attempt to navigate around the officer, the plaintiff accelerated, knocking down the officer, who subsequently fired several shots into the vehicle, striking the plaintiff in the neck, leaving him paralyzed. *Id*. Less than one minute elapsed from the time

28

plaintiff placed his vehicle in the cruiser's path until the officer fired his weapon. *Id*.

Even though there were no vehicles or pedestrians in the immediate field of view of the officer's cruiser, the court in *Williams* found that "there [could] be no question that [the plaintiff's] reckless disregard for the safety of those around him in attempting to escape posed a threat to anyone within the vicinity." *Id*. at 487. Ultimately, the court concluded that the facts were undisputed that the "immediate threat" the plaintiff posed to the officer and other drivers and pedestrians, coupled with the fact that plaintiff was willing to do all he could to evade capture, made the officer's chosen use of force reasonable. *Id*. at 487–88.

Plaintiff directs the Court to *Cupp*. There, responding to a complaint of telephone harassment, the officer-defendant arrested and handcuffed the suspect-decedent and placed him in the back of the officer's running police cruiser. *Cupp*, 430 F.3d at 769. While the officer was speaking with someone else on the scene, the suspect climbed into the front of the cruiser and took control of the vehicle. The suspect put the car in gear, and the officer shot at the vehicle as it passed by. The district court found questions of fact that precluded summary judgment. Specifically, while the defendant-officer believed that the suspect had directed the stolen cruiser at him while barreling down toward his position, the plaintiff "describe[ed] a scene where [the suspect] was merely trying to flee in the cruiser and [the officer] shot [the suspect] under circumstances of no threat to [the officer] or others." *Id*. at 770.

The court affirmed the district court's decision not to resolve the issue of qualified immunity on summary judgment, noting "[i]f the facts are taken in a light most favorable to the plaintiffs, no person at the scene was ever in danger. A reasonable jury could conclude that [the officer] did not fire as the vehicle was bearing down on him in fear of his life. Instead, a jury could conclude that [the officer] fired as he ran toward the driver side of the car after the car had

passed him." *Id.* at 774. In so ruling, the court held that "although events developed rapidly, under plaintiffs' version of the facts this is not a case where a dangerous situation evolved quickly to a safe one before the police officer had a chance to realize the change." *Id.* at 774–75.

Additionally, the Court finds *Sigley* instructive. There, officers attempted to box in the suspect's vehicle in a parking lot following a controlled narcotics buy. One of the officers exited his vehicle and approached the suspect's car on foot with his weapon drawn, and commanded the suspect to stop. The suspect backed up his vehicle to try to escape, hitting one of the cruisers in the process. According to the officer, the suspect put his car in gear and drove directly toward him at a speed of approximately 30 to 40 miles per hour before the office fired, fearing for his safety, and killed the suspect. Under the plaintiff's version of the facts, the officer chased after the suspect's car as he drove from the scene, and shot the suspect in the back after the vehicle had safely gone past him. *Sigley*,  437 F.3d at 530–31.

The court concluded that there were conflicting views of the facts that made the district court's grant of qualified immunity inappropriate, emphasizing that there were unresolved factual issues regarding whether the officer was chasing after the suspect's car or the car was turning into him when he fired. *Id*. at 536. Additionally, the court found a factual dispute as to whether the officer had probable cause to believe that the suspect's vehicle posed a significant threat of death or serious physical injury to the officers or others on the scene. *Id*.

The Court also finds illuminating the Sixth Circuit's decision in *Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008). There, the parties provided two divergent views of the facts of a fatal police shooting. According to the defendant officers, the decedent's vehicle was bearing down on one of the officers at a high rate of speed while the officer was standing directly in the path of the vehicle. The defendant-officers fired several rounds at the vehicle, believing that the officer—

who was attempting to move to the side of the vehicle—was in jeopardy of being run over. *Id.* at 478. The plaintiffs, who relied primarily on the testimony of an eyewitness and an expert accident reconstruction, believed that decedent's vehicle was traveling in a slow and non-threatening manner around the vehicles and the officers. *Id.* at 479. Importantly, under their version of the facts, "none of the officers were ever in harm's way[,]" with the officer on foot at least six to seven feet away from the decedent's vehicle. *Id.*

The Sixth Circuit determined that the district court properly denied the defendant-officers summary judgment based on qualified immunity, noting that "considering the allegations in a light most favorable to the party injured," there were unresolved questions of facts regarding whether a constitutional violation had taken place and whether, under those same facts, the right was clearly established. *Id.* at 482 (quotation marks and citation omitted). The court emphasized that, under the plaintiffs' version of the facts, the decedent's car was moving slowly, could not have hit any of the officers, and was "stationary" at the time of the shooting. *Id.* at 482. Because "no one was ever in danger" under these facts, the court determined that "a jury could conclude that reasonable officers would not have perceived an immediate threat." *Id.* at 483. It further held that, "[a]t the time of the shooting, it was clearly established under . . . *Garner* . . . that police officers may not fire at non-dangerous fleeing felons such as [the decedent]." *Id.*

Finally, the Court also acknowledges the Sixth Circuit's recent decision in *Stewart v. City of Euclid*, 970 F.3d 667 (6th Cir. 2020). In *Stewart*, a suspect hit a patrol car before one of the officers was able to gain entry to the suspect's vehicle as he drove away. The officer eventually shot and killed the suspect from inside the suspect's vehicle. The court ultimately found that the officer was entitled to qualified immunity based upon the fact that there were no cases addressing the unique fact scenario involving "the danger faced by an officer inside a fleeing

suspect's vehicle[.]" *Id*. at 675. Nevertheless, the court observed that there were questions of fact regarding the first prong of the qualified immunity analysis, noting that "[s]ome of the circumstances in this case suggest that [the officer's] use of deadly force was reasonable. Others—specifically, [the suspect's] lack of aggression toward [the officer], the low speeds at which he was driving, and the fact that the car may have been already stopped at the time he was shot—allow a reasonable jury to find facts showing [the suspect] did not present an immediate danger of serious physical injury and thus the use of deadly force was unreasonable." *Id*. at 674.

Of course, the present case has factual differences that distinguish it from each of the cases above. *See Brosseau*, 543 U.S. at 201 ("this area is one in which the result depends very much on the facts of each case"). Nevertheless, they provide a foundation for evaluating the parties' perspectives on the specific facts surrounding Officer Mannella's use of force.

Ultimately, however, the disputed facts in the present record are what drive this case. On the one hand, a jury could find that a reasonable officer would have recognized that Burroughs was in the process of complying with his directive to stop, and that the officer was in a position of complete safety when he fired his weapon upon the slowly moving car. On the other hand, a reasonable jury could determine the disputed facts in such a way so as to conclude that Officer Mannella properly used deadly force when his life was in imminent peril in a dangerous and rapidly evolving situation whose conclusion was impossible to predict. *See Palma v. Johns*, No. 1:18-cr-294 (6th Cir. Feb. 28, 2022) (Readler, J., dissenting) (recommended for publication) ("Our inquiry into the reasonableness of the force used 'focus[es] on the 'split-second judgments' made immediately before the officer used allegedly excessive force' and does not discount those split-second judgments if they result from an escalating series of events.") (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007)). At least under

defendants' view of the facts, a jury could find that Officer Mannella was directly in the path of a vehicle moving toward him, and that he did not fire upon the vehicle until it was bearing down on him. As discussed more fully below, it is plaintiff's version of the facts that the Court must credit on summary judgment. Still, the Court emphasizes that this is an extremely close call.

>    **E.     Analysis and Conclusion on Fourth Amendment Violation**

Unlike the situation presented in *Williams* (and in line with the circumstances presented in cases like *Kirby*, *Sigley*, and *Cupp*), the Court concludes that there are genuine issues of material fact that preclude a grant of qualified immunity on summary judgment. Under plaintiff's version of the facts, Officer Mannella was never in harm's way, as he was positioned to the right of Burroughs' vehicle, and the vehicle was slowing down and in the process of stopping at the time Officer Mannella fired. This version of events is not definitively contradicted by Officer Reppy's BWC that showed the Ford Fusion's brake lights illuminated and Officer Mannella positioned to the right of the vehicle, the expert opinions of Fries, and the testimony of Officer Hogan, who indicated that the vehicle was "[s]lowing down to a – to a great degree" when Officer Mannella opened fire on the vehicle. (Doc. No. 39-5 at 12(38).) *See, e.g., Godawa*, 798 F.3d at 468 (facts issues precluded grant of qualified immunity where, under plaintiff's version of the facts, officer was located ahead of the vehicle to the right of the passenger side during the relevant timeframe, and the driver never targeted the officer); *Kirby*, 530 F.3d at 482 (under the plaintiffs' version of the facts, the decedent's car was moving slowly, could not have hit any of the officers, and was "stationary" at the time of the shooting). Under these facts, as viewed in the light most favorable to plaintiff, Officer Mannella would have lacked probable cause to believe that his life was in imminent danger at the moment he fired on Burroughs. *See, e.g, Sigley*, 437 F.

3d at 536 (factual dispute as to whether vehicle had turned toward officer before he used deadly force).

Also, while Officer Mannella was aware that Burroughs had fled the municipal building and knocked down a probation officer in the process, there was no evidence that Burroughs led police on a dangerous high speed chase through a densely populated area before arriving at the apartment complex. Though Officer Reppy testified that Burroughs' speed was excessive for the area, he estimated that Burroughs was only traveling between 40 and 45 miles per hour through areas that had moderate to no traffic. (Doc. No. 39-2 at 12–13 (36–37).) Officer Hogan also estimated that Burroughs entered the apartment complex area traveling at 30 to 35 miles per hour, which he described as "[d]ecent but not over [the speed limit]." (Doc. No. 39-5 at 8(22).) Even though courts have found that prior reckless behavior justified the use of deadly force, those cases generally involved a suspect's "obvious willingness to endanger the public by leading the police on chases at very high speeds and through active traffic[,]" something that is not present in this case. *Latits*, 878 F.3d at 551 (collecting and distinguishing cases involving car chases through traffic at speeds of over 85 miles per hour).

Further, from the time Burroughs entered the area adjacent to the apartment complex and was first in Officer Mannella's field of vision, the record facts viewed in favor of plaintiff suggest that Burroughs might have been trying to maneuver his vehicle in such a way that he could escape the scene. (Doc. No. 39-4 at 6(14).) At no time did Burroughs rev his engine or squeal his tires (Doc. No. 39-2 at 19(63); Doc. No. 39-5 at 10(30)), or slam on his brakes (Doc. No. 39-5 at 9(28)). Additionally, though he came "nose-to-nose" with another officer's cruiser, Burroughs avoided hitting the cruiser by means of a "controlled stop". (Doc. No. 39-5 at 8(23), 9(25–26), 12(38).) Crediting plaintiff's version of the facts, Burroughs then attempted to stop his

34

vehicle and was traveling at a very slow speed (if he was moving at all), away from Officer Mannella, when Officer Mannella fired. Accepting these facts, a jury could find that Officer Mannella was not faced with "a situation that required a 'split-second' decision, nor one where 'a [possibly] dangerous situation evolved quickly to a safe one before the police officer had a chance to realize the change[.]" *Kirby*, 530 F.3d at 483 (quoting *Graham*, 490 U.S. at 397; *Cupp*, 430 F.3d at 774–75). "Instead, this is a case where a jury could conclude that Officer [Mannella] was not in any danger in the first place." *Cupp*, 430 F.3d at 775.

Considering the totality of the circumstances in a light most favorable to plaintiff, the Court concludes that a jury could find that Burroughs did not present an imminent or ongoing danger to the officers or others at the scene. "A jury would therefore be entitled to determine that Officer [Mannella's] use of force was unreasonable and accordingly unconstitutional." *Cupp*, 430 F.3d at 775. As such, there is a question of fact as to whether a constitutional violation occurred, precluding summary judgment in favor of Officer Mannella on this basis.

### F.      Clearly Established Right

The qualified immunity analysis does not end with a determination that there are questions of facts regarding whether Officer Mannella's use of force was objectively unreasonable. *See Godawa*, 798 F.3d at 467. The Court must also determine whether the constitutional right at issue was clearly established at the time of the incident. *Id.* (citing *Pearson*, 555 U.S. at 231).

At the time of the shooting, it would have been clear to a reasonable police officer that he "may not fire at non-dangerous fleeing felons[.]" *See Kirby*, 530 F.3d at 483. "In *Garner*, the Supreme Court held that the 'use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.'" *Id.* (quoting *Garner*, 471 U.S. at

11). "'Where the suspect poses no immediate threat to the officer and no threat to others . . . the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'" *Id*. (quoting *Garner*, 471 U.S. at 11). Under plaintiff's version of the facts, Burroughs posed no immediate danger to Officer Mannella or any other officer or individual at the scene. A reasonable officer, therefore, would have understood that the use of deadly force in these circumstances would violate Burroughs' constitutional rights. *See, e.g., Kirby*, 530 F.3d at 483–84. Consequently, the constitutional right at issue was clearly established and Officer Mannella is not entitled to qualified immunity on summary judgment.

### G.     State Law Claims and Statutory Immunity

Ohio Rev. Code § 2744 provides immunity for state law tort actions for employees of political subdivisions, provided their acts and omissions were not "manifestly outside the scope of the employee's employment or official responsibilities" or were taken "with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" Ohio Rev. Code § 2744.03(A)(6)(b). "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004) (citations omitted). "Bad faith" includes a "dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id*. "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted). "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*.

36

Based on the same analysis presented above with respect to federal qualified immunity, the Court concludes that there are genuine issues of material fact that preclude summary judgment in favor of Officer Mannella on plaintiff's state law claims for wrongful death, assault and battery, and reckless conduct. In the same way that plaintiff has demonstrated that the facts, if viewed in the light most favorable to plaintiff, show that the officer's use of deadly force was objectively unreasonable, plaintiff has also shown that the facts would support a finding that Office Mannella acted with malicious purpose, in bad faith, or in a wanton and reckless manner. *See Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020) (noting that state law tort claims rise and fall with an officer's federal qualified immunity defense) (quotation marks and citations omitted).

In *Stewart*, the Sixth Circuit held that "[t]his court has previously endorsed the view that under Ohio law, 'if the trier of fact were to find that [the decedent] posed no immediate threat of harm to anyone else . . . then the officer's actions in shooting the decedent were reckless at best.'" *See Stewart*, 970 F.3d at 677 (quoting *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011) (further quotation marks and citation omitted)). Because the Court has determined that a reasonable jury could find facts showing that Burroughs did not pose an immediate danger of serious physical harm to Officer Mannella, it could also determine that the officer's actions in using deadly force were reckless. Thus, the Court denies Officer Mannella summary judgment on plaintiff's state law claims.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. Defendants the City of Niles, Jay Holland, James Reppy, and Paul Hogan are dismissed from this action, as are plaintiff's excessive force claim (Second Claim) against the

City of Niles and plaintiff's reckless hiring, training, supervision, discipline, staffing, and retention claim (Sixth Claim) against the City of Niles and Jay Holland. This action will proceed solely against defendant Christopher Mannella on plaintiff's excessive force claim against him (First Claim), and plaintiff's state law claims for wrongful death (Third Claim), assault and battery (Fourth Claim), and reckless conduct (Fifth Claim).

      **IT IS SO ORDERED**.

Dated: March 4, 2022

                                      _____
                                        **HONORABLE SARA LIOI**
                                        **UNITED STATES DISTRICT JUDGE**